**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

_____

SIPAPU, INC., a New Mexico corporation, SIPAPU RECREATION DEVELOPMENT, INC., a New Mexico corporation, and SIPAPU RECREATION DEVELOPMENT II, LLC, a New Mexico limited liability company,

        Plaintiffs,

v.                                                 No. CIV 01-954 BB/RLP

UNITED STATES OF AMERICA, UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture; ANN M. VENEMAN, Secretary of the Department of Agriculture, DALE BOSWORTH, Chief of the Forest Service; ELEANOR S. TOWNS, Regional Forester in Region III of the Forest Service,

        Defendants.

**COURT'S FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

THIS MATTER came on for a hearing on September 4, 2001, on Plaintiffs' Motion for Preliminary Injunction, and all evidence having been presented, having considered all the submissions of the parties, and having reviewed the applicable law, the Court now makes its findings of fact and conclusions of law:

**Findings of Fact**

1.    The Bolander family started the Sipapu Ski Resort in the early 1950s. The Special Use Permit to operate a ski resort has been in continuous effect since at least 1954.

2. In February-March 1980, a Special Use Permit, superseding a Special Use Permit dated 10/27/72, was issued to Sipapu Recreation Development, Inc. ("SRD") covering 185 acres for the purpose of maintaining and signing ski trails. At that same time, a Term Special Use Permit was issued to SRD covering six acres for maintaining and operating uphill lift facilities and a ski school.

3. In 1984, 1992, and 1996, Sipapu completed Summer Work Plans with the advanced approval and under the supervision of the Forest District Ranger. The Summer Plans involved clearing of trails, earthwork, re-seeding, installation, maintenance of lifts, and related work. At no point in time was Sipapu ever informed that the District Forest Ranger did not have the authority to grant approval for its Summer Work Plan within the Special Use Permit.

4. An Amendment for the Special Use Permit was signed by the respective parties in May and September 1985 authorizing replacement of Poma lift #1 with a triple chair lift.

5. Amendment Number 3 for the Special Use Permit was signed in June 1988.

6. In 1990, the Bolanders proposed a much more substantial expansion and the Forest Service undertook a full scale review, and in 1995, granted National Environmental Policy Act ("NEPA") approval. When local opposition surfaced, the Forest Service withdrew the NEPA approval.

7. Prior to filing the Summer Work Plan, Bruce Bolander took Forest Service employee Karen Cook over the Special Permit area and showed her what was contemplated on the ground.

8. On July 3, 2000, as he had in years past, Bruce Bolander wrote to the District Forest Ranger outlining Sipapu's Summer Work Plan. That letter spells out and attaches a map of the work contemplated for the Summer Work Plan for Sipapu. Specifically, the letter states as follows:

> As indicated on the attached map and discussed with Karen Cook on June 29, 2000, we plan to continue with our routine summer maintenance and add new beginner terrain areas and some areas for tree skiing for advanced skiers.
>
> The beginner terrain area will involve moving one of our existing lifts and clearing two beginner trails and a wide enough lift line to make ski terrain. This project will involve tree removal and a small amount of groundwork.
>
> The tree skiing area will involve the installation of a lift and tinning of section of trees to connect with existing trails. No ground work is planned for this project except what is necessary for lift installation.
>
> All work to be done is within our current permit area. All disturbed ground will be revegitated as required by our permit and all mercantile timber will be stacked for scaling.

9. On July 12, 2000, Cecilia R. Seesholtz, recently assigned as the Forest Service District Ranger, responded to Sipapu's July 3, 2000, letter stating.

> We have reviewed your summer operation plan and have found it within the parameters of your special use permit. Please be advised that if it should change in any way, you must notify us first and get approval. We hope your summer plans go well.

10. After receiving approval from the District Forest Ranger on July 12, 2000, Sipapu began work on its Summer Work Plan on July 22, 2000. The Summer Work Plan involved eleven new runs being cleared for tree skiing, engineering for installation and transfer of an existing lift, engineering and purchase of a triple chair lift, and hiring the proper personnel and contractors to install all the work set forth in the Summer Work Plan. Since Sipapu is a small ski area, funds were allocated for the summer work, which could have been used on other improvements of the ski area to attract or maintain additional or existing clients.

11. Once work began on July 22, 2000, eleven new runs were either cleared or thinned for tree skiing and extensive engineering was done for the installation of the new triple chair, engineering was done for the repositioning of the Poma lift, the triple chair lift was purchased, contractors and engineers were retained for the work, and laborers were paid to clear and cut down wood and for all related expenses.

12. The Forest Service was fully aware of the work being performed by Sipapu in the summer of 2000. In early September, Henry Lopez, a employee of the Forest Service who was involved in overseeing wood and timber permits in the district, sent Forest Service employees Joseph Montoya and Benny Chavez to inspect and assess the wood products that resulted from the clearing of the trails for the 2000 Summer Work Plan. Soon thereafter, Carol Holland from the District Forest Service Office inspected the project and determined the wood products would be sold as fuel wood and not as scaled timber.

13. A Forest Service permit was granted on July 12, 2000, for the wood that was being cut down to clear the trails.

14. On September 11, 2000, Sipapu received a fuel wood permit from the Forest Service District Office for 50 cords of wood. Thereafter, on September 19, 2000, Sipapu obtained another fuel permit from the district office for 50 cords of wood. Again, the permit was necessitated by the trees that were being cleared for the trails and runs, as approved by the Forest Service on July 12, 2000.

15. During the time that wood was being cut and cleared, many members of the community in and around Sipapu, who purchased permits from the Forest Service, came up and hauled firewood for use during the winter. On various occasions, representatives of the Forest Service were present to observe the trees being cleared and the wood being hauled.

16. In October 2000, Richard A. Miller, the Regional Tramway Engineer for the Forest Service, reviewed the plans for relocation of the Poma lift that was part of the 2000 Summer Work Plan that was submitted to and approved by the Forest Service.

17. By late November 2000, Sipapu was "past the point of no return" and had completed a majority of the work and spent approximately $250,000 towards its Summer Work Plan. It would cost at least $50,000 to restore the Poma lift and of course the previously removed trees would take decades to restore. The only major projects to be completed are the installation of the previously delivered chair lift and revegitation of the slopes.

18. Sipapu is a small, family-operated resort that has financially struggled in years past. In the last ski season 2000-01, it lost approximately $100,000. The determination to do the Summer Work Plan and to spend $250,000 constituted the single largest outlay for the business for the calendar year. If the Summer Work Plan had not been approved, the $250,000 would have been spent in other areas to try to draw consumers and to pay down existing liabilities.

19. Despite various interactions and inspections by members of the Forest Service, at no point from July 12, 2000, until the end of November 2000, was Sipapu ever told that its Summer Work Plan should not be commenced or was in violation of any federal law or regulation. To the contrary, each and every interaction with the Forest Service reinforced their consent and approval of the project.

20. On November 13, 2000, due to heavy snows, the Summer Work Plan was placed on hold until the following spring.

21. In September, Ranger Seesholtz received a telephone call from Mr. Shiller, from the Rio Embudo Watershed Protection Alliance, asking whether Sipapu had received a NEPA clearance. Ranger Seesholtz was informed by employee Karen Cook the appropriate NEPA study was in the file. This same scenario unfolded again in October. In November, Mr. Shiller requested a copy of the NEPA report and Ranger Seesholtz found only the 1995 NEPA approval which had subsequently been withdrawn by the Forest Service.

22. On November 22, 2000, Sipapu received a telephone call from Ranger Seesholtz who told Sipapu that upon a review of the Sipapu file, she should not have granted the approval in July of 2000 and there needed to be additional documentation completed by the Forest Service.  She orally withdrew her prior approval.

23. Between November 2000 and July of 2001, Sipapu met with the Forest Service and its various representatives to see how the matter could be remedied.

24. In early January, representatives of Sipapu met with Ms. Seesholtz at the district office about the fact that new investors were coming into the business.  The parties discussed Sipapu's need to complete the Summer Work Project and Ms. Seesholtz represented the Forest Service would be taking the necessary steps to complete its obligations under NEPA.  Sipapu made it quite clear that whatever paperwork the Forest Service needed to complete its obligations needed to be done so Sipapu could complete its 2000 Summer Work Plan prior to the beginning of the 2001/2002 ski season since the Poma lift was already removed and the slopes denuded.

25. Thereafter, on January 3, 2000, the NEPA calendar set up by the Forest Service was mailed to Sipapu.  Sipapu was not on the list which provided all of the pending applications in the district.  Mr. Bolander called Ms. Seesholtz directly and was told that there was plenty of time to complete whatever documentation the Forest Service felt would be needed.

26. Thereafter, on March 21, 2000, representatives of Sipapu met with Joe Meade, the Recreation Specialist from the Forest Service Regional Office, Jim Gladden, and

   Steve Okamoto, the Acting Forest Supervisor, about the project. In addition to discussions concerning the Summer Work Plan of 2001, the prior environmental impact statement that was published in 1995 was discussed. Sipapu representatives left that meeting with the clear understanding that the Forest Service would be able to submit and complete their paperwork before August 2, 2001, and if the project was approved, Sipapu would be able to complete its 2000 Summer Work Plan prior to the start of the 2001/2002 ski season.

27. Thereafter, the Forest Service stated that they would need additional maps evidencing potential future development of the ski area. On April 2, 2001, those maps were provided at a meeting attended by Martin Chavez, the new Forest Supervisor, Steve Okamoto, and Cecilia Seesholtz. Sipapu was told that funding for whatever documentation the Forest Service needed to prepare for the NEPA process had been obtained and the work would be put out to bid. Sipapu officials again left that meeting with the clear impression that any necessary Forest Service environmental work would be performed so that Sipapu would be able to complete its 2000 Summer Work Plan prior to the start of the 2001/2002 ski season.

28. Thereafter, in June 2001, Mr. Bolander spoke with Ms. Seesholtz, and despite promises to the contrary, was told the project had not been put out for bid at all and as a result there would be no way Sipapu would be able to complete its Summer Work Plan for the beginning of the 2002/2002 ski season.

29. On June 26, 2001, Sipapu wrote the Forest Service saying Sipapu was going to continue with its 2002 Summer Work Plan as previously approved. By letter dated June 29, 2001, the Forest Service notified Bruce Bolander that a master development plan was a requirement of the Special Use Permit and he had not submitted a master development plan. Sipapu received another letter dated July 6, 2001, from Mr. Chavez, stating that if Sipapu attempted to complete its work, the Forest Service would seek an order to show cause to stop the work and terminate its special use permit.

30. Sipapu again scheduled a series of meetings with the Forest Service to see if it could resolve the dispute without court action. At the August 10, 2001, meeting, it was determined by all parties that the Forest Service would not be able to complete whatever work necessary to allow Sipapu to complete its 2000 Summer Work Plan for the 2001/2002 ski season.

31. Having spent approximately $250,000 in reliance of the Forest Service's approval and authorization to commence its summer work, there is a strong probability Sipapu will have to close its doors unless it is allowed to place the ski lift, now sitting in its parking lot, into operation. In addition, the period in which Sipapu is to complete this project is quickly vanishing. If Sipapu cannot commence work by the middle of September, it will be unable to complete the project by the time the ground freezes at the end of October.

32. If Sipapu is forced into bankruptcy, it is likely 70 jobs, a very significant number in southern Taos County, will be lost.

## Conclusions of Law

1. The Court has jurisdiction over the subject matter of, and the parties to, this action based on Plaintiffs' credible allegations of a violation of the Due Process Clause of the Fifth Amendment. *NAACP v. Alabama*, 357 U.S. 449 (1958); *King v. Finch*, 428 F.2d 709 (5th Cir. 1970).

2. The foundation of injunctive relief is irreparable harm for which the law does not provide an adequate remedy. *Sampson v. Murray*, 415 U.S. 61, 88 (1974). Based on Plaintiffs' expenditure of $250,000 in reliance on Forest Service approval, if an injunctive remedy is not granted, Plaintiffs will likely face imminent financial collapse. Legal limitations on damage actions against the United States make it doubtful this loss could be adequately compensated.

3. The availability of an adequate remedy through the exhaustion of administrative remedies precludes equitable relief. *Whitehouse v. Illinois Central* R. Co., 349 U.S. 366 (1955); *Aircraft & Diesel Equipment Corp. v. Hirsch*, 331 U.S. 752 (1947). However, when a party provides a clear showing of irreparable injury and presents serious and difficult questions on the constitutionality of administrative action, injunctive relief would be appropriate without such exhaustion. *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974); *Parker v. Lester*, 227 F.2d 708 (9th

Cir. 1955); *Teamsters Public Employees Union v. City of West Point, Neb.*, 338 F. Supp. 927 (D. Neb. 1972); *cf. Alabama-Tombigbee Rivers Coalition v. Dept. of Interior*, 26 F.3d 1103 (11th Cir. 1994) (affirming injunction prohibiting Interior from using unauthorized private report).

4. As of this date, the Forest Service has taken no final action from which an administrative appeal would lie. Nor can it say they have sufficient budget commitments to complete a NEPA environmental impact study within the next six months. Ranger Seesholtz testified such studies take 6-12 months. She also testified compliance with the Endangered Species and State Historic Preservation Act must occur before approval.

5. Exhaustion of administrative remedies is not required where claimants would be forced out of business and thereby be unable to pursue or benefit from appeals from a cumbersome administrative process. *Valdez v. Applegate*, 616 F.2d 570 (10th Cir. 1980).

6. To obtain preliminary injunctive relief, the moving party bears the burden of establishing four requirements:

   a. the movant will suffer irreparable injury unless the injunction issues;

   b. the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party;

   c. the injunction, if issued, would not be adverse to the public interest; and

   d. substantial likelihood that the movant will succeed on the merits.

*Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980); *see also Walmer v. U.S. Dept. of Defense*, 52 F.3d 851, 854 (10th Cir. 1995).

7. If this Court does not grant equitable relief, the movant will suffer irreparable injury. The "status quo" is that the Defendants seek to withdraw their approval after Plaintiffs spent $250,000 in reliance thereon. Based on its reliance on Forest Service approval, Sipapu spent $250,000 which has placed it on the edge of financial ruin.

8. The threatened injury to Sipapu, Inc., outweighs whatever damage the proposed injunction may cause the United States Forest Service which failed to take the timely and appropriate action which could have prevented this situation.

9. The public would be adversely affected by the loss of 70 jobs if Sipapu collapses. The environment may also be detrimentally affected if the already deforested slopes continue to remain without vegetation and subject to further erosion.

10. While the placement of the chair lift does have some limited potential to be adverse to the environmental interest, the required $100,000 bond should provide adequate means of ameliorating or restoring any such damage.

11. As of this date, no transfer of SRD assets has occurred and the Special Use Permit appropriately remains in its name.

12. Plaintiffs have raised serious legal issues which fairness requires be addressed immediately and on which it has a substantial likelihood of success. Indeed, based on only those facts presently before the Court, if a damage remedy were available, it seems likely punitive damages would be appropriate.

DATED at Albuquerque this 17th day of September, 2001.

                                              **BRUCE D. BLACK**
                                              United States District Judge

Counsel for Plaintiff:
      Robert D. Sckalor, Frank M. Bond, Simons Firm, Santa Fe, NM

Counsel for Defendant:
      Jan Elizabeth Mitchell, Assistant U.S. Attorney, Albuquerque, NM
      Andrew A. Smith, Trial Attorney, U.S. Dept. of Justice, Albuquerque, NM